BUTTERFIELD v METAL FLOW CORPORATION

Docket No. 115512. Submitted May 8, 1990, at Grand Rapids. Decided October 2, 1990.

A. William Butterfield entered into an agreement in January, 1980, with Metal Flow Corporation whereby Butterfield would act as a manufacturer's representative for and would supply certain equipment to Metal Flow and would receive in exchange a "three percent sales commission on accounts listed or developed in the future" and ten percent of Metal Flow's existing capital stock. The agreement further provided that Butterfield could, upon payment of $5,000, purchase an additional five percent of the existing capital stock if exercised before April 1, 1980. Butterfield exercised that option by making the necessary $5,000 payment in March, 1980. Metal Flow, however, did not transfer the stock to Butterfield. In January, 1983, Butterfield was informed that he was terminated as Metal Flow's manufacturer's representative because he had continued to represent one of Metal Flow's competitors. In March, 1983, Butterfield was notified that his ownership interest in Metal Flow had been terminated and that the value of his ownership interest had been determined to be $22,500 plus the return of a piece of equipment worth $2,500 and was tendered a check in the amount of $11,275 with the promise of the balance being paid within one year. Butterfield commenced an action in Oakland Circuit Court, which was transferred to Ottawa Circuit Court, seeking commissions from sales made after plaintiff's termination to customers which plaintiff had secured and seeking damages occasioned by defendant's failure to transfer the stock to plaintiff as promised. The jury found that the parties had not intended that plaintiff receive commissions on all future business with customers secured by plaintiff and that the value of the stock on the date of the breach of contract in January, 1983, had been $45,000 and that the value of the stock at the time of trial was $180,000. The trial court,

REFERENCES

Am Jur 2d, Agency § 264; Contracts § 355; Damages § 88.

See the Index to Annotations under Agents and Agency; Close Corporation; Damages; Questions of Law and Fact.

James E. Townsend, J., determined that the proper measure of damages was the value of the stock on the date of the breach and entered a judgment of $45,000 plus interest and costs. Plaintiff appealed.

The Court of Appeals *held:*

1. The question whether it had been the intent of the parties that plaintiff be paid commissions on all future sales to customers he secured was a question for the jury. Since the jury was properly instructed and there is competent evidence to support the jury's verdict, that verdict will not be set aside.

2. The proper measure of damages resulting from the breach of a contract to deliver' capital stock is the highest value of the stock within a reasonable time following the breach. Since the jury found only the value of the stock on the date of the breach and on the date of the trial and was not instructed to find the highest value of the stock within a reasonable time after the breach, a remand for a retrial on that question is necessary.

Affirmed in part, reversed in part and remanded.

1. CONTRACTS — TRIAL — JURY — EVIDENCE — APPEAL.

The actual terms of a contract will generally be determined by the jury where the terms of the contract are contested, even where the evidence of the contract terms is uncontradicted; the jury's verdict will not be set aside if there is competent evidence to support the jury's findings.

2. DAMAGES — CONTRACTS — BREACH OF CONTRACT — STOCK — CLOSELY HELD CORPORATIONS.

The proper measure of damages for failure to deliver shares of stock is the highest value of the stock within a reasonable time after the breach of the contract to deliver the stock; that measure of damages is applicable even though the stock in question is the stock of a closely held corporation.

*Varnum, Riddering, Schmidt & Howlett* (by *Joseph J. Vogan*), for plaintiff.

*Eric J. McCann,* for defendant.

Before: NEFF, P.J., and MAHER and MURPHY, JJ.

PER CURIAM. Plaintiff appeals as of right from a judgment of the circuit court entered in his favor in the amount of $45,000 plus interest accruing

from the filing date of plaintiff's complaint, together with applicable costs. We affirm in part and reverse in part and remand this case to the trial court for further proceedings consistent with this opinion.

This case arises out of defendant's failure to deliver fifteen percent of its existing shares of stock pursuant to a January 28, 1980, agreement with plaintiff.

In late 1978 or early 1979, Curtis Brown and his son, Mark, incorporated defendant, which at that time was a small stamping business located in Holland, Michigan. At that time, plaintiff was operating as a manufacturer's representative for several companies in Michigan.

In early 1979, Brown discussed with plaintiff the possibility of plaintiff serving as a manufacturer's representative for defendant. In late summer or early fall 1979, plaintiff began serving as a manufacturer's representative for defendant, even though the parties were still uncertain as to the actual arrangement regarding plaintiff's compensation for serving in that capacity for defendant.

On or about January 28, 1980, the parties reached an agreement as to the arrangement under which plaintiff would serve as a manufacturer's representative for defendant. On February 12, 1980, the parties signed a letter confirming the terms of their agreement. According to the agreement, plaintiff was to receive a "three percent sales commission on accounts listed or developed in the future." The parties also agreed that defendant would transfer ten percent of its existing stock ownership to plaintiff in exchange for plaintiff's contribution of particular pieces of equipment. The agreement further called for defendant's transfer of five percent of its stock owner-

ship as of April 1, 1980, in exchange for a $5,000 cash payment by plaintiff.

In March, 1980, plaintiff paid the $5,000 necessary to receive the additional five percent of defendant's existing stock. However, defendant did not transfer any of its stock to plaintiff.

While serving as a manufacturer's representative for defendant, and with Brown's knowledge, plaintiff continued to represent other manufacturers. However, on January 31, 1983, Brown wrote a letter to plaintiff informing him that defendant was terminating him as a manufacturer's representative. The letter stated that the decision to terminate plaintiff's relationship as defendant's manufacturer's representative was a result of plaintiff's representation of both defendant and one of defendant's direct competitors.

On March 15, 1983, Brown again wrote to plaintiff and informed him that plaintiff's ownership interest in defendant had terminated because of plaintiff's representation of both defendant and the competitor. The letter further stated that defendant had determined the value of plaintiff's ownership interest to be $22,500, plus the return of a particular piece of equipment contributed by plaintiff with the value of $2,500. Along with the letter, Brown enclosed a check for $11,275 and informed plaintiff that defendant would pay the balance plus ten percent interest within one year.

Plaintiff commenced this action in Oakland Circuit Court, but venue was transferred to Ottawa Circuit Court.

During trial, the parties disputed the proper measure of plaintiff's damages. Plaintiff alleged that his damages caused by defendant's failure to deliver the fifteen percent shares of outstanding stock were to be measured by the value of defendant's stock at the time of trial. Defendant, on the

other hand, argued that plaintiff's damages were to be measured by the value of defendant's stock as of the date defendant terminated plaintiff as a manufacturer's representative.

The jury was requested to determine the value of fifteen percent of defendant's outstanding stock both at the time of trial and as of January 31, 1983. The jury valued the stock at $45,000 as of January 31, 1983, and at $180,000 as of December 9, 1988, the date of trial.

The trial court thereafter entered an opinion which stated that the proper measure of damages was the value of the stock at the time of plaintiff's termination as a manufacturer's representative for defendant and that it would enter judgment in favor of plaintiff for $45,000, plus interest. Accordingly, the trial court thereafter entered judgment in favor of plaintiff for $45,000, plus interest.

I

Plaintiff first contends that the jury's verdict in favor of defendant as to plaintiff's claim for post-termination sales commissions was erroneous and contrary to law and must be reversed. We disagree.

At trial, plaintiff requested that the jury award damages in the amount of a three percent commission on all sales and future sales occurring after plaintiff's termination on defendant's accounts which plaintiff had "developed" while serving as a manufacturer's representative for defendant. Plaintiff's request was premised on the theory that defendant had agreed to pay plaintiff a three percent commission, not merely on all sales procured, but on all accounts procured. However, the jury refused to award plaintiff any posttermination sales commissions and returned a verdict in favor

of defendant on plaintiff's claim for posttermination sales commissions.

Plaintiff now contends that the jury's verdict was erroneous and contrary to law and that he was entitled to posttermination sales commissions because Brown admitted that the contract called for plaintiff to be paid the three percent sales commission for all future sales from those accounts or customers procured by plaintiff while serving as defendant's manufacturer's representative.

Plaintiff relies on our Supreme Court's decision in *Reed v Kurdziel,* 352 Mich 287, 293-295; 89 NW2d 479 (1958), in support of his claim that he is entitled to posttermination sales commissions. In *Reed,* our Supreme Court addressed the right of a sales agent to recover posttermination sales commissions:

> An examination of the law with reference to commissions allowed agents or brokers seems to indicate that it is difficult to determine a set line of decisions, particularly with reference to the right of an agent with an exclusive agency to recover commissions on sales made where he is the procuring cause. However, when they are viewed as a whole and brought into proper focus, they disclose the law applicable to the question is well settled and that the seeming confusion results from the application of that law to the particular facts of the specific cases in question. 12 ALR2d 1360, 1363, states as follows:
>
> "The relationship between agent or broker and principal being a contractual one, it is immediately apparent that whether an agent or broker employed to sell personalty on commission is entitled to commissions on sales made or consummated by his principal or by another agent depends upon the intention of the parties and the interpretation of the contract of employment, and

that, as in other cases involving interpretation, all the circumstances must be considered. . . . This rule is recognized and stated in the American Law Institute, 2 Restatement, Agency, § 449, Comment a."

It would appear that underlying all the decisions is the basic principle of fair dealing, preventing a principal from unfairly taking the benefit of the agent's or broker's services without compensation and imposing upon the principal, regardless of the type of agency or contract, liability to the agent or broker for commissions for sales upon which the agent or broker was the procuring cause, notwithstanding the sales made have been consummated by the principal himself or some other agent. In Michigan, as well as in most jurisdictions, the agent is entitled to recover his commission whether or not he has personally concluded and completed the sale, it being sufficient if his efforts were the procuring cause of the sale. *Reade v Haak,* 147 Mich 42 [110 NW 130 (1907)]; *Case v Rudolph Wurlitzer Co,* 186 Mich 81 [152 NW 977 (1908)]; *MacMillan v C & G Cooper Co,* 249 Mich 594 [229 NW 593 (1930)]. In Michigan the rule goes further to provide if the authority of the agent has been cancelled by the principal, the agent would nevertheless be permitted to recover the commission if the agent was the procuring cause. *Heaton v Edwards,* 90 Mich 500 [51 NW 544 (1892)]; *McGovern v Bennett,* 146 Mich 558 [109 NW 1055 (1906)]; *MacMillan v C & G Cooper Co,* supra.

Defendant argues that plaintiff's argument is without merit because the trial court adequately instructed the jury on plaintiff's theory of recovery for posttermination sales commissions and the jury rejected plaintiff's claim. Defendant also argues that the principle set forth in *Reed* applies to a sales agent's procurement of sales, not customers.

Generally, when the terms of a contract are contested, the actual terms of the contract are to

be determined by the jury even when the evidence of the contract terms is uncontradicted. *Guilmet v Campbell,* 385 Mich 57, 69; 188 NW2d 601 (1971). This Court will not set aside a jury's verdict if there is competent evidence to support the jury's findings. *Hodgins v The Times Herald Co,* 169 Mich App 245, 257-258; 425 NW2d 522 (1988), lv den 432 Mich 895 (1989).

The trial court gave both initial and supplemental instructions setting forth plaintiff's theory of recovery for posttermination sales commissions and adequately instructed the jury concerning plaintiff's theory of recovery.

Brown testified that defendant's agreement with plaintiff called for a three percent sales commission to be paid for all sales on defendant's accounts procured by plaintiff. However, he also maintained that that agreement was to govern while plaintiff remained as a manufacturer's representative for defendant. Accordingly, there is competent evidence to support the jury's finding that plaintiff is not entitled to posttermination sales commissions. There is also competent evidence contained in the record from which the jury could have inferred that plaintiff committed the first substantial breach of the contract and that defendant was therefore not required to perform further under the contract.

II

Plaintiff also contends that the trial court applied an improper standard for measuring the damages caused by defendant's failure to deliver fifteen percent of its existing stock and erred in awarding plaintiff damages in the amount of the value of the stock at the time of plaintiff's termination as defendant's manufacturer's representative.

In awarding damages to plaintiff caused by defendant's failure to deliver the stock, the trial court found the proper measure of plaintiff's damages to be the value of defendant's shares of stock on the date of plaintiff's termination as a manufacturer's representative for defendant. Plaintiff contends that the proper measure of his damages is the value of defendant's stock at the time of trial. In support of his position, plaintiff relies on *Vos v Child, Hulswit & Co,* 171 Mich 595; 137 NW 209 (1912).

In *Vos,* our Supreme Court addressed the proper measure of damages for a breach of a contract for the sale of stock. The plaintiffs sued to recover damages for the defendant's failure to deliver certain shares of publicly traded stock for which the plaintiff had previously paid. The day after the plaintiff in *Vos* paid for the stock, the price of the stock advanced. The defendant would not deliver the stock to the plaintiff until the plaintiff paid the advance in the stock's market price. The plaintiff refused to make any additional payment and requested the return of his purchase money. The trial court entered a directed verdict in favor of the plaintiff in an amount reflective of the advance in market price, but reasoned that, because the plaintiff had a duty to mitigate his damages, the plaintiff should have purchased the stock from the defendant for the advance price and then sued to recover the difference between the price paid and the contract price. *Vos, supra,* p 596.

On appeal, our Supreme Court determined that the proper measure of the damages caused by the defendant's failure to deliver the stock was the highest value which the stock had attained during a reasonable time after the defendant's breach. Our Supreme Court stated:

Plaintiff concedes that the court gave the true rule of damages for a failure to deliver personal property, but he insists that that rule is not the proper one to apply where the breach counted upon is a failure to deliver stock; but in such case the plaintiff is entitled to a reasonable time after the breach to purchase the stock himself, and that he is entitled as damages to the difference between the contract price and the highest value of the stock during such reasonable time. There is much support in favor of this contention. In several of the States the ordinary rule of damages for a failure to deliver personal property seems to have been enlarged in the case of a failure to deliver stocks in accordance with the contract. This exception to the general rule and the reasons which gave rise to it are well stated by Mr. Justice Sanborn in *McKinley v Williams,* 74 F 94; 20 CCA 312 [CA 8, 1896)]:

"Compensation is the general standard for the measure of damages. It is the actual and proximate loss caused by the wrong for which the plaintiff is entitled to indemnity. Hence the general rule is that the measure of damages for the failure to deliver property according to the contract, or for its conversion, is the value of the property at the time it was to be delivered, or at the time it was converted. This general rule, however, has been found inadequate to furnish just indemnity for the losses occasioned by the conversion of, or the wrongful failure to deliver, stocks and other properties of like character, the values of which are subject to frequent and wide fluctuations. The general rule gives to the agent, broker, or person in possession of such property that is really valuable, frequent opportunity to convert it to his own use, at a time when its market price is far below its actual value, and thus offers a prize for the breach of duty, while it often leaves the injured party remediless. To prevent this injustice, and to throw the chance of this loss upon him who inflicts, rather than upon him who suffers, the wrong, an exception has been ingrafted upon this

general rule. It is founded upon the proposition that he who deprives another of the possession and control of such property ought to assume the risk of the fluctuations in its market value, until its owner, by purchase or sale, can restore himself to the condition in which he would have been if his property had not been wrongfully taken. It rests upon the proposition that the risk of the market during this time should be assumed by the perpetrator, not by the victim, of the wrong. The exception is that the measure of damages for the failure to sell or to deliver stocks and like speculative property, or for the conversion thereof, is the highest market value which the property attains between the time when the contract required its sale or delivery, or the time of its conversion, and the expiration of a reasonable time, to enable the owner to put himself *in statu quo,* after notice to him of the failure to comply with the contract or of the conversion. . . . Counsel for the appellant argues that this rule should not be applied to this case, because the stock which the appellant obtained never became the property of the appellee, and hence could not have been converted. The answer is that this measure of damages is as applicable to actions upon contracts as to those upon torts. *Barnes v Brown,* 130 NY 372, 382; 29 NE 760 [1892]; *Maynard v Pease,* 99 Mass 555 [1868]." [*Vos, supra,* pp 596-598.]

In awarding plaintiff damages caused by defendant's failure to deliver fifteen percent of its existing stock, the trial court here distinguished our Supreme Court's decision in *Vos* and found that, if there is no market source available to replace the stock, the rationale of the exception enunciated in *Vos* breaks down and there is no justification for deviating from the general rule that damages are to be measured as of the date of breach. The trial court held that the rule in *Vos* does not apply to shares of stock of a closely held corporation and that the rule applies only to shares of stock read-

ily available from the securities market. The court concluded that plaintiff is entitled to a judgment equal to the value of the stock as of January 31, 1983, the date of the breach of contract. However, under *Vos,* plaintiff may recover the stock's highest value during a reasonable time following defendant's failure to deliver the stock. This exception to the general rule of law has also been applied in another jurisdiction even where the stock is that of a closely held corporation. *Jones v Nat'l Chautauqua Co Bank of Jamestown,* 272 AD 521; 74 NYS2d 498 (1947).

Although a closely held corporation's stock is not publicly traded, and no established market value exists to assist the courts in valuing a closely held corporation's stock, the courts generally recognize that a closely held corporation's stock has an ascertainable value. *Olsher v Olsher,* 78 Ill App 3d 627; 397 NE2d 488 (1979). Although a closely held corporation's stock is not subject to daily fluctuations in price as is publicly traded stock, the record here indicates that defendant's stock may have been subject to great fluctuations in value.

The jury here was requested to make a determination of the value of defendant's stock at the time defendant terminated plaintiff as its manufacturer's representative and at the time of trial, but it was never required to determine the value of the stock within a reasonable period of time after the breach. Accordingly, we reverse the trial court's judgment and remand this case to the trial court so that, consistent with *Vos,* a jury may determine the value of defendant's stock within a reasonable period of time after the breach.

Affirmed in part, reversed in part, and remanded to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.